Good morning, Your Honor. It's my pleasure to court. My name is Prolai K. Das. I'm a lawyer of the law firm of Fort Harrison. I'm here on behalf of the Respondent Hospitals, Your Honor. Judge Bress, with the court's permission, I'd like to reserve four minutes for a rebuttal argument, please. So we've raised five claims in this case, but there's really one overall arching issue here that addresses at least the first three claims. Did the hospitals violate the NRA when they took certain emergency actions in response to the COVID-19 pandemic? And the answer to that question is no, for at least two reasons. First, the hospital's actions were permitted by the management rights clauses of the collective bargaining agreements. And second, even if the management right clauses did not apply, there was still no duty to bargain with respect to these actions because of the exigent circumstances rule. Now, the two main actions we're looking at here are, first, the temporary pandemic pay program, and second, PPE policies with respect to storage, usage, and training. Let me start with the temporary pandemic program and just at least explain what that is to put it into context of legal issues that are presented here. Just before you go on, some of the issues are really separate from that. Primarily, the fact that the extension of the pay plan was not applied to some of the represented employees, that doesn't have anything to do with these other issues. Your Honor, I think that gets covered with respect to the temporary pandemic pay program. The overarching issue is we complied with the collective bargaining agreement, but we obviously secondarily have an argument with respect to the extension, which is second with respect to the duty to bargain. What about the cost of living? I mean, that would seem different. That has nothing to do with the pandemic. That's correct. Those are the last two issues. Issue four and issue five aren't related to the overall issue, and I'll address them at the end. But I want to really get to the heart and soul of our claim here, which is how the hospitals reacted to the COVID-19 pandemic. And really, the overarching program is this temporary pandemic pay program. And just to put it in context of why it came into being, when the pandemic broke out in March, when we hit our national emergency and statewide emergencies in March, if you looked at the television reporting, it was all about hospitals in New York being overrun with COVID patients. That's not what was happening in Southern California at the time. The COVID surge hadn't hit yet. So what was happening in Southern California is we had a dearth of patients. We had a decline in patients that were coming to the hospital. And that happened because, one, there was a moratorium on elective surgeries, and two, people weren't going to the hospital for non-COVID-related care. So the hospitals were put in a position where— So we're very—I mean, we all read—so we're very familiar with this. And assuming we agree with you with all that, why is this not a benefit? I found it kind of odd that you'd argue that this is not a benefit. It's not compensation, but it doesn't even need to be compensation. It just has to be a benefit. Why is it not a benefit? So our position—obviously, the court gets de novo review on that issue, and your court's correct that the board disagrees with us on that. We don't believe it's a benefit, and it doesn't fall within 59.1. And if we're right about that, then 14.2 controls. So your Honor is correct that, in our view, this isn't a benefit because it's not something that's given in addition to what they would otherwise receive. The employees here were simply giving something as a stopgap. The employees, without the exception of this pandemic— Well, if I—you know, if I'm going to work for somebody and say, if you get disabled—we have a disability benefit. You get disabled and you aren't able to work, we will pay you. I mean, you could characterize that as not something in addition because I would be getting paid if I wasn't disabled, but now I'm getting paid, notwithstanding the fact that I'm disabled. But everybody would think of that as a benefit, I think. But what—that's what this is. We have this benefit that if there's—let's say they had done this ahead of time and people had known COVID. If there's a pandemic and you can't—and hours drop off or something happens that your hours drop off, we will make sure you get paid 70 percent, if I remember right. I apologize if I'm not getting the numbers right. But we'll make sure you get at least 70 percent of what you were going to get. It just feels like some of a—it's like a kind of an unemployment-y type benefit to me. So, again, all of those are predictable issues. So in those situations, when you negotiate for them, for example, health care, for example, disability benefits, it's all based on predictable actions. In this case, what happened is the hospital's in a position where these workers didn't get what they were expected. So you're—the fact that this is not a benefit, your turn's on the fact that you think it was not predictable. And it's trying to understand. Right. And it doesn't line up when we're looking at—it doesn't line up with like terms, I suppose, is the way we look at it from a contract interpretation standpoint. The examples that are given are wage increases, bonuses, something that's in addition to what the expectation of the employees would be. And that's—this isn't in addition to— So if I understand right, if they had had this benefit from the beginning, you know, if there was not COVID but they'd said, you know, just in case things happen, you know, some massive employer moves out of the area so the population drops and we just can't keep our nurses busy, we're going to have this benefit where we make sure you get 70 percent of your— would you agree that that was a benefit? Yeah. And I'd actually go further and I'd say if that was included as a like term, this would be closer to fitting within that clause. But because what's clear about—again, we're looking at the intent of the parties from the plain language of cause. Because this clearly doesn't fit. Really, it's a stretch to bring this paid pandemic—temporary pandemic program into that clause and to make it similar to the other benefits that are in place. Because the other ones are all situations where you're giving something extra, a compensation— But this is extra. I'm really baffled by your argument that this isn't a benefit. It's extra because people are being paid for not working. And it's similar to being paid for not working for a vacation or for illness or for a disability. So why isn't it a benefit? Again, I think because in our view it doesn't match up with the other what else is contained in 59.1. That's giving benefit a broader definition. I think the parties understood it.  It's evidenced because, again, all of the things that you have in place with respect to benefits are things that generally would exist for the life of the collective bargaining agreement. In this case, that's not the case. This is a temporary pandemic program. It's only a seven-week program. So it's not a benefit because it's temporary? In part, yes, because it wasn't contemplated with respect to the parties. So this is something that is literally an unforeseen stopgap in order to ensure that the employees don't leave the company and don't leave their employment. So that's why you're — I mean, your unforeseeability is, I guess, weighs in favor of your argument, if I understand right. Even if it is a benefit, your argument is the exigent circumstances. We needed to do this. That seems to go more towards that. But it's harder for me to see how that somehow makes it not a benefit. Well, Your Honors, if the Court — again, it's a plain reading. I don't want to hold you up. You know, it's a plain reading of the term. It doesn't match up. Our view is it's not a benefit because it's not additional. But let's — to your point, if the Court believes 59.1 applies, if 51.9 doesn't apply, no question we'd fit under 14.2. But if it — then we're under exigent circumstances. And the exigent circumstances here should have been applied because this was absolutely necessary for the hospital to be able to provide for care when there was a rise in COVID. The concern here was that if individuals are not getting — But as to this particular hospital, there was no shortage of staff at that point or any showing that there was about to be or anything like that, right? Well, Your Honor, I think — again, that's the problem, I think, with the NLRB's argument and how they try and distinguish the Metro Man case from this case. The hospital shouldn't be in a position where they wait until there's a shortage and then scramble to fix the problem. But all — but except for the fact that we're not saying you can't — they didn't say you couldn't do it. They said you had to bargain. No. Again, because of the exigent circumstances, if we take time to bargain at that point, we're going to lose the staff. What the hospital had to do was maintain adequate — But there's no evidence that you were losing staff. If you started to lose staff, then maybe you could do something, but you weren't losing staff. Your Honor, I think it's just a matter of common sense that if an individual is not getting paid, they're going to go find new employment. You had to stop that by putting at least a 70 percent pay in order to tell folks, don't leave, we need you. And that's to protect against the surge that we knew was coming based on the California Department of Health. Is there any evidence in the record even that there was — that there was already people who were working less? No, because the hospital acted quickly to make sure that didn't happen. I'm sorry, what? The hospital acted quickly to make sure that didn't happen so that they could provide the care. They didn't want to be in a crisis situation where they can't recover. So there wasn't yet an exigency. There might be an exigency, but there wasn't yet an exigency. Well, that was the exigency. Keep in mind, this program was implemented March 31st. The state of emergency by President Trump was put on March 13th. Besides which we — I mean, we're reviewing the Labor Board, right, which as to factual determinations, there's a substantial evidence standard. There's not at least substantial evidence that there was no exigency yet? I think both Governor Newsom's and President Trump's declarations of public emergencies show that exigent circumstances exist. There is an emergency. I also think the California Department of Public Health's healthcare mitigation playbook demonstrated and warned hospitals that they had to have adequate staffing. They're the ones that warned about the fact that there's going to be this rush of COVID patients, and you're going to have to have adequate staffing. That's the response. So the hospitals are on notice that there is these emergency scenarios coming up. I see I only have five minutes. If there are any — Can I ask one follow-up question? So the — practically speaking, I'm not an expert on NLRA, NLRB stuff. Practically speaking, it is — you know, when I saw this case, it seemed like a little bit like the hospital — I'm sympathetic in that the hospital seems to be punished for having done a good deed here, right? But the agreement apparently does say that if you want to do a good deed out of benefit, you have to negotiate. What is the upshot of them having found a violation here? I'm trying — as a practical matter, I mean, what people got, it seems like, is they got — they would have maybe made no money because they would have been laid off for a week, but instead they got 70 percent of the money they would have gotten. So what kind of thing — what can people do with the fact that if we were to uphold the violation here? Well, the answer is if you look at the appendix to the — to the NLRB decision, they're asking the hospital to post signs saying we were absolutely wrong in the way we conducted ourselves. And your point, the hospital is just trying to do the right thing in the most trying of circumstances. And so — So essentially nothing. I don't think that's nothing. That's a significant issue, and the management is trying to do as best they can. I also want to jump back very quickly to the 59.1 issue. The other position that we have with respect to that is the unions did receive notice of the program. They just decided not to bargain over it. So, you know, the fact that they didn't insist or even request bargaining over it once they received notice — No, it seems kind of crazy because they're saying you need to bargain with us to take it, to give it to us, and now we're mad at you that you're taking it away and you didn't bargain with us to take it away. So I get all your points. It's just — it seems kind of odd, but I'm trying to figure out what comes out. I assume if we were to agree with them on the taking it away, then people get money, right? They get what they — you know, if they ended up not working for that period of time, there's some damages for that. That order applies to — But the giving of it is — all it is is just that you have to — that the hospital has to eat some crow by — Well, to your point, there is a — with respect to one of the union's represented parties, there's a financial component as well. Could I just — I've got three minutes if I could just switch to the PPE issue just very quickly. Again, that's not a new issue that came up. This is changes to the existing training policy and the existing, you know, storage policy, just changes in policy. This is governed by 14.1, which is a very broad management clause provision. It gives exclusive — Well, I mean, I — you may be right on the exigency issue more with regard to the PPE because there it seems more colorable that there was a national problem here and so on. But the new policy now has a discipline provision that wasn't in the training before. So, at least as to that question, the discipline provision should — must there have been — and there's an exception for job security. Correct. So, why would any of you at least have to bargain about that? Yeah, Your Honor, I think the answer is because the training itself was within the authority of the management. The fact that there was this provision, there was never any claim or any threat that someone actually was disciplined or that someone was doing this based on a particular — it's not the discipline the issue, it's determination. But there were — the training provisions before did not have that provision, right?  That's correct. All right. And it's now in there. So, it did affect security, job security. And so, why isn't it just per se there had to be a bargaining about that, not about the rest of it? And in the record, there's no one saying, I was worried about losing my job, and that was never promoted. But what difference does that make? And I guess the answer is they're permitted. And this is why, to your point, this issue and the storage issue are actually broader than the pandemic. They're really important for this reason. The hospital can't be put in a position where every time they move supplies to a different storage position or they change a training program that's designed for patient safety and patient treatment that they have to negotiate with the unions. We can't have that rule. It's going to handicap the hospital from being able to provide. I know. But I just floated a different proposition, which is that isn't what you had to bargain about, but what about the discipline provision? And, again, I think that that broad language that's in the slide, it didn't really come to fruition in any way. And if there was someone who said, I was scared of losing my job, then perhaps it might be an issue. But anything in a collective bargaining agreement may not come to provision — to fruition. I mean, in other words, you can't put into policy — you can't announce that you're going to have a policy that X, even though it wasn't bargained, and then say, but it never actually happened, so we didn't violate our obligation to bargain. This is about an obligation to bargain, whether it ever came to fruition or not, because you put in effect a new policy. To your point, I think the big issue that we need from this court to make very clear is that when we have changes to training policies, especially when they're dealing with patient care, the management has to retain hospital unfettered discretion, broad discretion like it has. To your point, if there is — if they then take action that does affect job security, that should be. But it's really — this decision says that the change in training itself was enough to be able to require bargaining, and the hospital can't live with that rule. We have to be able to provide training directly related to patient care. And the corollary to that, we have to be able to have storage policies with respect to equipment and supplies in order to provide for patient care, policies to provide PPE, N95 masks. That has to be within the hospital's discretion. Or because we trust hospitals provide for patient safety, patient safety has to trump, quite frankly, any kind of duty to bargain. And that's what this collective bargaining agreement does. It's a very broad — So when would there be a duty to bargain in this kind of situation involving the PPE? I mean, there's the notion in the slide that this — you might be disciplined if you don't comply with the policies on PPE. Would there be some future situation in which all of a sudden this would ripen into a bargainable situation? You know, I think if it was more direct, like you will be fired if you don't, you know, follow this guideline, that's a closer call on whether or not — because now you're balancing that job security provision. I think that this is just too broad a read of what this was within the context of a training program. And I want to get away a little bit about the training program because the two nurses who objected to it were doing it based on the policy of how the PPE was being rationed. And that's really the fundamental claim that they have here. And that has to be within the hospital's discretion. Can I ask you — I know we've taken you over, but we'll make sure you have time for rebuttal on the foreseeable pecuniary harm issue. The way this has been positioned in the brief is a little abstract. It's almost like you're making some kind of — you know, it's a broad-based, almost like a facial challenge to this — is it Thrive ruling? Is there another point in time in which you could make a more direct — a more specific challenge to this where you have some kind of enforcement order that you can then say that this particular remedy or relief that's being awarded, that is that that is now exceeding the statute? You're correct. This is an issue that is, you know, present in a lot of cases right now. But I think it is squarely in this case because it does violate the order that was provided by the NLRAB. It violates the plain meaning of the NLRA and what the authority is. But we have no idea whether it actually has any application here. Well, we do because it went beyond back pay. Our point is that any — when you provide this kind of financial remedy, the NLRB — Congress limited the NLRB to providing back pay. That's what it specified. It wanted to provide more. I know, but the actual financial remedy hasn't been determined, right? Well, it's been described, which is a no. I understand. But there's a — this is what Judge Press was asking.  There's a second — another proceeding to occur if — to the degree we enforce the petition.  I can't report what the indirect — I'm sorry? I can't report what the scope of the indirect damages that were awarded here are. All I can say is they're consequential damages. And then as a matter of law, which is the fundamental threshold question, should — does the NLRB have the authority to award those type of damages, consequential damages, even though we haven't monetized what that is? Yeah, we haven't monetized what that is, or even if it exists. I mean, it may be that nobody's going to show up and say because you — I mean, the only thing that this is relevant to are the pay to the professional employees — well, I don't know. It's the 2 percent raise. And what else? We don't — to your point, we don't know the scope of whether it's — I'm sorry? To your point, we don't know, because it says indirect damages, whether — What other possible back pay is there? You know, for credit card debt, someone goes into a foreclosure — No, but that would be — I'm just saying, of the issues in this case, to which are — are there any monetary relief possible? I guess they would be — I don't know the answer to that. All I know is that the NLRB's order includes other — Right, and this notion that there may be credit card debt or whatever, we have no idea whether there's going to be any. That's right. We're just talking about — So why are we deciding this now? Because it's about the board's authority to act, which is the threshold question. This is beyond the statutory authority of the board to act. But they may not act. There may be nothing to act on. They already issued the order. That's the legality of their order. And that's what's before this Court. Well, but it's contingent. I mean, if there are any such claims, we will pay them. They will be paid, but we don't know if there are any. Again, Your Honor, I think the threshold issue of authority is still here, regardless if that number is $1, $0, or $100. If you are ordered later to pay something, the hypothetical credit card debt, do you have the ability to come back here and say that is unlawful? I don't know what the NLRB would be arguing. They say we raised it here, and so is that law of the case? I don't know how this would come out. I do think we're properly here. I'm just asking procedurally. I don't really see how it would be law of the case for something that hasn't been ordered yet. I agree. I don't want to waive any arguments in a future proceeding that's there. All I can say with respect to this proceeding, if this Court declines to reach it, declines to reach it, but it is properly before this Court because it goes directly to the authority. Well, something is before us. You've made an argument, essentially, that the NLRB's foreseeable harm standard is inconsistent with the statute at a very broad level, so we could resolve that, but there is an unknown here about what specific dollars and cents your clients might be ordered to pay and to whom and for what, and if there's some later time in which you are ordered to do that, are you able to come back to this Court and to say, well, now we have a very specific problem. We have some credit card debt, and we believe that credit card debt is consequential damages. I'd preserve the ability to raise that, but again, our position is we shouldn't even get there because of the threshold question about the NLRB's authority to act, and they acted beyond their authority. Okay. So let's have you take a break here, and we'll hear from your opposing counsel. We'll put four minutes on the clock for rebuttal. Thank you, Your Honor. Thank you. Good morning, Your Honors. May it please the Court, Michael Hickson for the NLRB. It sounds like I should probably spend most of my time talking about the exigent circumstances issue and the management rights clauses in the contracts for the violations that's applicable to the NLRB. Can I ask a going-in question? You say at the very end of your brief that there was an argument, that there was another case raising the TRIV question that was argued in this Court. I'm sorry, Your Honor. The what question? The TRIV. Oh, okay. Sorry. I say Thrive. Sorry. I'm not sure.  That was argued in this Court in March. Yes. Do you know the status of that case? It's not been decided. It's been fully briefed, fully argued. It's pending decision of the Court. All right. And if that case were — if they addressed the issue, it would have priority over us. So do we need to — I mean, I guess we should get to the question of whether it's properly before us. But if it were properly before us, I guess we'd probably have to — we might have to suspend submission of this case. Your Honor, I guess I'm not — to the extent, certainly, the other panel is much further ahead in their review of that.  I mean, we have a rule that says that. I mean, basically, they have priority. I mean, because it was submitted first, not because — it's not a question of which one comes out first. So, all right. So then the question becomes, is the issue even properly before us? And what's the answer to the question Judge Bress was asking, i.e., once there is an enforcement action, is there another petition to this Court that's available? Yes, Your Honor. First, just to respond to your earlier point, I have to in candor admit that I was not aware of a rule about — with the case being submitted first. Well, that's our — that's our rule. I wasn't familiar with that, Your Honor. I apologize. That is our rule. Go ahead. To answer Judge Bress's question, yes, there would be, if the Court enforces the Board's order, then the case would proceed to what's called the compliance process, which in the vast majority of cases are resolved informally. But sometimes they do proceed to formal proceedings before an ALJ and eventually subject to Board review. And in that proceeding, the general counsel, if the general counsel believes that there is evidence of foreseeable — direct or foreseeable pecuniary harms, then the general counsel would have the burden to come forward with that evidence and to prove precisely what those harms were, what was their nature, what was their specific amount as to which individuals, and why they constituted either foreseeable or direct harms that were directly caused or foreseeably resulted from the specific unlawful actions of the hospitals. And eventually, Your Honor, if it did proceed so far as a — a supplemental order from the Board, that would be subject to this Court's or another appropriate Court's review. In your experience, is this Thrive case changing anything? Is it doing any work to broaden the relief that's given? Or is it, in practice, just sort of making something sound potentially broader, but in the end of the day you're still getting back pay or other things that you would be otherwise entitled to regardless of Thrive? Our view is that the Board is clarifying in order to better carry out its mission and effectuate the Act's policy. Wasn't the question. The question was what has been the practical effect of it. You really need to answer, listen to the questions. I apologize, Your Honor. I am trying my best. I guess perhaps I misunderstood. What I'm trying to understand is what effect is this decision having in the actual award of relief? Because you might look at this and say this is not changing anything. Or you might look at this and say this is actually changing a lot. It's very much broadening the relief that's available. What's actually happening on the ground in terms of the implementation of this decision? Your Honor, I think the most direct answer to your question is I don't know because that would be playing out in either compliance proceedings or settlements in the Board's regional offices across the country. And I'm not familiar with what's happening. What was the point of Thrive then? I mean, was it to put people on notice that, in fact, there's more relief available out there than you might have expected? Or why else does this all of a sudden seem like a big deal and being raised in lots of cases? The point, as the Board's explanation in Thrive in the decision, was that it was clarifying in order, again, to better effectuate the Act's policies, that make whole relief includes all direct or foreseeable. But was there some sense that relief that was — that should have been available was not being given? I'm not — I'm not sure, Your Honor. The Board did identify in its decision a number of examples in which it did order direct or foreseeable pecuniary harms. And it said that it was essentially standardizing and clarifying what its practice had been. Okay. Can we talk about the PPE? I think Mr. Das makes a valid point that where PPE is stored and who has access to it, can that really be — reasonably be the subject of collective bargaining, given that it seems like something that's a little bit more minutiae in the operation of the hospital? What's the NLRB's response? Sure, Your Honor. First, to the extent, I guess, that the hospitals are arguing that this was not a mandatory subject of bargaining, I don't think they've — I don't think they've adequately argued that issue before the Court. So I think it's waived. But to respond further, it did — these policies, which were interrelated, did change the employees' working conditions substantially in three ways. They changed the location of the storage of the equipment. Previously, it had been located on every unit and on every floor of the hospital's two towers, and then they moved it from out of each unit in each floor of the two towers and put it all in one location. And that does substantially hinder the employees' ability to access this safety gear at work to protect themselves against workplace hazards. They further restricted access and usage of the safety equipment by imposing these new, I guess, restrictive conditions on usage. Previously, the unrebutted testimony was that employees could freely access the equipment as they deemed it necessary in the course of carrying out their duties. Now employees had to answer these sort of qualifying questions to prove whether they could have access, which, among other things — I think we're familiar with kind of the facts of what happened here. The challenge, I think, that I'm struggling with, too, is on one hand, it just seemed like it's a hospital, right? It seems like it's got to be — to protect the patients, it's got to be able to have these kind of policies be something that it can change, especially in response to the kind of conditions that were going on at COVID. On the other hand, as I understood your response, your response is safety equipment, the safety of the nurses, the safety of the medical professionals is a subject of bargaining, which doesn't sound super crazy either. And so, you know, if we think something is going on that's unsafe, the union should be able to go and say we want to have this thing. And so I kind of see the arguments on both sides, but it does seem like, you know, if you tell a hospital that it can't respond like it responded here — your argument is there's nothing in the record to show that this was a bad enough circumstance. There was going to be a shortage of PPE, but I mean, I remember, I mean, we all lived through that time, right? There was, I mean, everybody was trying to get their hands on masks. It's understandable that somebody would have been — that your nurses would have been wanting to take masks home to their family, et cetera. It doesn't seem to be an outrageous response to that. So why can they not respond that way because of the exigent circumstances? Sure. So on the exigent circumstances, I think it's very important to be clear on exactly what the standard is and what the burden was. So the hospitals, prior to implementation of these new policies, the hospitals did not give the union any prior notice. They never notified the union. They never gave the union any opportunity to bargain whatsoever. So the — I mean, that's what exigent circumstances give them the right to do, right? I mean, if it was an exigent circumstance. Yes, Your Honor, but it — that helps clarify what their burden was. So their evidentiary burden, their heavy evidentiary burden under the unchallenged exigent circumstances standard was to show that a potential future equipment shortage was so severe in scope and so imminent in terms of the timing that no amount of pre-implementation bargaining was possible. The standard is not for the hospitals to show that they had serious concerns about the possible consequences of an eventual equipment shortage or to show that their planned actions bore a reasonable relationship to those concerns, or even to show that circumstances might have justified a demand to the union that bargaining over this issue be wrapped up in an expedited manner. That's not the facts of this case, because they gave the union zero opportunity to bargain at all. The board does recognize that the amount, including in, for example, the RBE electronics case and in other cases, that the amount of time that is necessary for good-faith bargaining depends on all the circumstances. Your position is that they should have said, I mean, theoretically, we're not going to give you weeks. Here's what we're thinking about doing, and we're going to — we need to know your answer in a day, maybe. I can't. So my answer is that — I mean, one of the challenges of that is that if what you're concerned about is that this stuff is going to disappear, and it's my understanding from reading the record is that some of these masks were used very rarely, the N95 masks, before COVID. But then I do remember during COVID, suddenly there was at least a phase when it was like, you need to get an N95 mask. That's the kind of mask you need to get. And so if that was what was going on, and the hospital had some, but it had them for these previously rare circumstances, why do you not think there's going to be a run on that? It seems reasonable for the hospital to think there's going to be a run. And then to tell all of its staff, hey, we're thinking about making this change that's going to make it harder to get, don't you think you'd have kind of a race to get it before it moves? But, Your Honor, their burden was to show that at this specific facility, by specific evidence, that the shortage was both so extraordinary in scope and so imminent that they could not bargain with the union at all. Or the expected shortage, right? Right. Yes. But they presented no evidence of that. What their obligation was... I think they kind of just relied on... I mean, did you know people that were hand-making masks during COVID? Did you? No, Your Honor. A lot of people did. I mean, people were. And I don't know if it was because there was a shortage of masks or they just thought they were. I mean, this was... That's what was going on during COVID. Sure. We lived through it. Absolutely, Your Honor. And it was a very serious nationwide crisis. But the status of the nationwide pandemic and the employer's status as a hospital did not... This was a more specific crisis. I mean, again, we may all be reflecting that we did live through it. With regard to the availability of PPE material nationwide, so that the... It seems that... Insisting that they had to demonstrate that they didn't have enough masks at that moment was sort of superfluous because it was clear that once they were used up, they were going to have a major problem. And moreover, if they used them up, they were creating a problem for other people. Yes. But respectfully, Your Honor, there was a general nationwide shortage of equipment that, of course, varied to great extents and to great degrees between the thousands or however many hospitals there are across the entire country. And those facts on their own did not empower the hospital to mitigate their collective bargaining obligations. But whatever their obligation was to bargain before, there's still this discipline issue, which wasn't any kind of an emergency and could have been bargained about separately. And second of all, I've never quite understood... I say this as a lawyer who's post... As a former lawyer who should have known these things. I don't know what effects bargaining is in these circumstances. But the board separately found that there should have been effects bargaining. What does that mean exactly? Your Honor, the effects bargaining, just to be clear, the effects bargaining violations were an alternative finding, so were the court to...  I understand. But what does it mean? If they had an ob... If they didn't have an obligation to bargain in advance, but they had an obligation to engage in effects bargaining, if there was, in fact, an exigency, a sufficient exigency, what did they have to... They had to bargain about its continuation. Did they have to bargain about its details? Did they have to bargain about the discipline? What did they have to bargain about as effects bargaining? I think with respect to the PPE, the bargaining would have been about having already moved the mask and, you know, established these... Well, I mean, it could be simply, I suppose, you know, we ought to move them back. Or people shouldn't have to... Or they ought to be available more broadly or something. So this affects something that happens after the decision has been made? Is that what we're talking about? The decision is made. This is how we're going to move the masks. We now are operating under that rule. Now we're having to bargain over what should we do going forward. Is that what effects bargaining is? Typically, yes. It's how... The decision having already been made, bargaining over the continuing effects that that decision is having on... Including whether to keep the policy? Including whether to keep the policy? I think it could, Your Honor. I can't say that I know... Because what other effects was the policy having? Well, it could have been about what were the conditions under which employees had access, for example. I mean, I guess the only reason we're into the exigency box is if we conclude that this was, you know, a subject of required bargaining under the CBA, and the only thing that's the hook for that is the slide? No, Your Honor, respectfully, I disagree. I don't agree with that. The CBA argument and the exigent circumstances argument are both affirmative defenses that the hospitals have to prove in order to show that they did not violate the statute. Okay, fair enough. So, yes. Even so, though, what is the import of the slide that we're talking about? The slide that says, if you don't comply with this, you'll be subject to discipline. I'm paraphrasing it. Right, well, because the CBA says that although the employer has some general rights to act unilaterally with respect to certain management functions, that any action that has a direct effect on unit members' job security, they cannot act unilaterally. Right, okay. So would we really say that this directly affects the job security? Yes. Okay, how? What is the record evidence that would support that? Sure. I mean, I think first just the fact that there is a new work rule, these new set of interrelated policies, establishes new grounds upon that were not there before. These are new grounds where the unit nurses could be accused of having misstepping, of having done something wrong and be subject to discipline. Then you have the express. Couldn't you say that about any change that's made to any method or means by, you know, the CBA provision talks about methods and means by which operations are carried on. Here they have a slide that says, by the way, if you don't comply with the PPE, you can be subject to disciplinary action. But it's generally a rule of all employment, places of employment, that if you don't follow the policies, you're subject to disciplinary actions. This is sort of belt and suspenders. And I guess my question is, are we going to say that sort of any, if you take the position that any violation of a hospital's policy is going to get you out of this, it seems like this provision that allows the hospital to change the methods and means of its operations is not doing a whole lot of work. I guess I would make a few responses, if I could, Your Honor. First, not — I don't think that everything that is covered by that language about the management rights to carry out the operations of the hospital would constitute an employee work rule. This is an employee work rule. On top of that, it's made that much more clear in this case on the specific facts by the fact that they — the hospitals specifically threatened the employees with discipline up to termination if for any failure to comply with this rule. The threat that you're referring to is the slide? Yes, Your Honor. Admonished, if you like, the employees that they were subject to termination. I don't think that establishing a new work rule that was not there before and then saying if you misstep under this work rule, we may terminate you, that it can seriously be doubted that that diminished the employee's job security. So can I ask just like a specific example of that? Let's say suddenly they decide that, you know, I'm sure you're washing your hands all the time in a hospital. I don't work in a hospital. And all of a sudden they say, we want you to wash your hands one additional time, you know, between these two procedures. You used to not wash between them, but now we want you to wash your hands between these two procedures. And so, A, would that alone be something they need to bargain before they can implement, that they need to — and, B, if that alone would not be, if they said you need to wash your hands and, by the way, if you don't, we're probably going to have to let you go, then it would be. Like, I'm just trying to figure out the implications of your position. I think, Your Honor, that it's hard to say. It's all very fact specific. But I think that it would be a mandatory subject of bargaining. Now, whether it would be in — What's the hook for that aside from the discipline aspect? What's the hook of the — just because it's a safety issue? What's the hook that makes it — it's not your pay or something. I see. What's the hook? I see. Without the warning of — this express warning of discipline, yeah, I guess I'm not — I'm not sure where that would fall. So your argument really turns on the fact that the slide — That's what I'm trying to figure out. I think this goes to Judge Bress's earlier question. I'm just trying to figure out how much of your argument is the slide or versus — I thought you also had an argument that, well, the safety issues are properly a subject of the union's bargaining for the safety of the employees. And so the slide was an and, also, not the only reason. Well, right, because the warning of discipline is integrated with, interrelated with the other changes. But it seems that the difference between the hypothetical, i.e., wash your hands again, and the concern here is that this was a employee safety concern. Right. In other words, it is — it may be partially motivated by the hospital to protect patients, but the concern on the part of the union and the employees is that it diminished the safety.  Yes, Your Honor. And there's some material in the record with nurses saying, you know, I couldn't — they were making me wear these unsafe masks, and it was a safety problem. Yes, Your Honor. I think that you're absolutely correct. That is a very material point, that this is employee safety gear to protect the employees against workplace hazards that they face in carrying out their duties. And to further answer the point about — about effect on job security, contrary to what Mr. Doss, I think, suggested, there is evidence in the record that the nurses were widely concerned about discipline from these policies, the nurses and the union. And that when the union, in a meeting that's discussed, it's cited in our brief and it's also discussed in the decision, that at a labor management meeting that was held when one of the union representatives repeatedly pressed one of the managers of the hospital as to whether nurses — the hospital was, in fact, going to discipline nurses who wore N95 masks if they worked on a designated non-COVID unit, and the manager basically refused to respond to those repeated questions. There's also the fact that the director of labor relations conceded in his testimony that because the nurses in this case are subject to a progressive disciplinary system, that any infraction even, you know, any — any infraction could lead to or precipitate their discharge. But my question is, does that lead to the conclusion that the whole thing was bargainable or that the discipline piece was bargainable? I think it's all bargainable, Your Honor, because I think they're — I think they're interrelated. Why is that — why is that right, though? It seems that what we're talking about here is whether it directly affects the job security. So it seems that you might ask, well, why wouldn't that piece of it be bargainable? The hospital can move PPE around. It seems like something they should be able to do without having to get — have a sit-down discussion about that. But it's a little bit different if you're going to start imposing rules on employees for what they can and can't do. Right. But I — again, I think that they're all integrated. The — the training that included the admonishment about your subject determination was a codification of the changes in policies, including the new restrictions on usage and the movement. If a nurse attempted to use the equipment outside of the newly imposed restrictions, then they were now subject to termination. Similarly, if a nurse tried to take a box of the N95s and said, even though we're a non-COVID unit, all these people keep getting COVID on our floor. We're going to take this box up to our floor. That would be — you know, that would be arguably a violation of the centralization policy, and therefore also new grounds for discharge. Do you want to briefly address — I know you're way over your time, but the other issue that I found somewhat difficult was the question of the extension or the failure to extend the paid plan to the professional employees and whether — first of all, as I understand it, there was an announcement made to the employees in general that the plan would extend to — till late June. Then there was some notice given to the national union, but not to this union, of a desire to bargain about that for both the nurses and the professional employees. Then somehow or other, and I can't really understand how, it turned out that the nurses did end up getting all that money, I guess because it was — I don't know why. Is that right? So we're left with the professional employees. The failure to bargain with regard to the professional employees.  So the — yes. The rescission of the paid program was only ever alleged by counsel for the general counsel with respect to the professional employees. I see. There's nothing in the record to indicate why it was not alleged with respect to the nurses. All right. So then with respect to the professional employees, they were in the middle of bargaining. There was no overall impasse. There was no bargaining about this. As I understand it, the defense is that it wasn't really — it wasn't a unilateral change because it wasn't a change. Is that basically the argument? I — my — the way I understand their position, and I'm not sure Mr. Doss will correct me, but the way I've understood it is that what they're saying is there was no rescission, there was no change. Same thing, I guess, in this circumstance, because the program simply expired. And — In fact, they first told the employees that they were getting this, and then they said they weren't going to get it. Right. When they first established the program, they said it's going to continue for 7 weeks. That's the plan, for it to continue for 7 weeks. And this was a letter sent to all employees? An email sent to all employees, including the — Including the professional employees. Including the professionals. Then, before the original scheduled end date happened, which was May 16th, before that happened, on May 12th, the employers sent a follow-up mass email to all the employees, including the professionals, saying, announcing without qualification the program will now be extended through June 27th. They rescinded the program with respect to the professionals. After that — I think that's as good as that. Thank you very much. Thank you, Your Honors. I respectfully ask — One more question. Yeah, one more question. Sure. The same question I asked yesterday, what is the — I'm trying to figure out what the practical upshot is of — if we were to find that the unilateral implementation of the pandemic pay program did violate the NLRA, what is the practical upshot of that? Because it seems like it's just — it's an extra benefit they got. And maybe they don't have a right to give that extra benefit without bargaining, but what — is there damages that flow from that or something? No. So the make-all remedy relates to just the — the make-all remedy relates to the rescission of the pay program for the professional units and to the withholding of the annual 2 percent cost-of-living increase for the professionals. Those are the only — But why did you — why did anybody even care to bring this claim? You know, you usually don't bring claims that don't — that something doesn't flow from. Oh, it doesn't. Yes, Your Honor. There is — there are portions of the order that flow from the violation about the — I'm sorry, this is about the — right, the implementation of the program. There's the cease and desist, for example. I mean, the — Don't do this again. Don't give us something that's helpful again. Don't unilaterally change the representative employee's working conditions without bargaining with the union again. And if they, you know — if once it's been enforced by this Court, eventually there's the possibility of contempt, for example. Okay. No, I'm just — There's also the notice — the notice posting that I believe Judge Berzon identified where they identified that to the employees. There's also — I believe there's a provision in the order that says with respect to the professionals, you know, I think it says — or not with the professionals, for everyone. I think it says rescind the program on request of the union, though I gather it's already been rescinded, I think.  So that probably wouldn't have a real-world effect here as far as I know. But thank you for the time, Your Honors. We respectfully ask for full enforcement. Thank you, Mr. Hickson.  Mr. Das. Good morning again, Your Honors. If I may, I want to go back to the temporary pandemic pay program and address the extension issue and kind of — Of course, Your Honor. I just didn't hear you. Go ahead. Oh, I'm sorry. And address what happened here, because obviously, you know, we were discussing whether this comes within the scope of 59.1. Let's say that it does. Our position is the unions receive notice. They never ask the bargain over it. So the issue is waived. What then happens is — and I guess this comes to — But their position, the board's finding was that it is implemented before the notice. The notice was after the fact. So that was their position with respect to the initial decision, correct. But to your point on effects bargaining, then the question becomes, are they able to extend it? And with respect to that, what the hospitals did, they expressly reached out to the represented entities here and said —  Actually, they didn't. They reached out to the international union at a different local, not this local. And representational decisions or orders are with regard to particular unions. So the people they reached out to were not the representative of the employees. So there was an exchange and multiple exchanges between management and the executive director of the union about whether to extend the program for the represented bargaining units. What the hospitals needed to do and what they wanted to do with that was — What executive director of what? Executive director of the union that represents all four of these bargaining units. Yes. But after the fact, the notice was — the only notice that was given before the fact was the employees were told that it was going to be continued, and then there was a notice to the wrong unions before the fact. What happened here was all after a decision was made. Is that right? No, because the decision was made with respect to the unrepresented workers. The decision, what the hospitals were discussing with the represented workers — and this makes sense when you look at the pandemic situation. Except that the letter went out to everybody. Correct. It was an announcement. But then they spoke to the unions. And, again, what they wanted to do was say, because of the situation that we have here, we shouldn't — unions, you shouldn't take your — And when was that with regard to the expiration of the original order? I think May 15th. Right. After the expiration? No. It was the expiration of May 16th. With regard to the proper — correct union? Yes. And it was actually extended to June 6th in order for those represented members so that we could have those discussions. And what the unions — what the management was trying to do was say, hey, because of the financial circumstances of the pandemic, don't take your raises this year. And the unions said, we're not negotiating. That's off the table. Well, they said we're not negotiating with regard to the nurses because we have a contract and it's binding and we're not going to change it. Correct. And that was their position. That became impasse with respect — and that's why the hospital decided to extend. It wasn't impasse because there was no open bargaining at that point. There was no — there was only — there was only ongoing bargaining with respect to the professional employees. And nobody refused to bargain with regards to the professional employees. Well, that was because the executive director, when they contacted the — in response, stated that they were acting on behalf of those three bargaining units. They just didn't mention at all the professionals. And that's why the view was they were serving a claim with respect to the nursing nurses and not on behalf of the professionals. So that's the exchange that occurred there. I also just want to very quickly jump to the PPE issue and that there was no evidence in records. That's not accurate. We have testimony from the chief nursing officer in the record that there was a shortage of supply of PPE and there was a theft issue. And, of course, the California public — Department of Public Health issued in its COVID mitigation plan a directive to hospitals to protect PPE because of the global loss of those resources. And, you know, finally, I want to note, again, with respect to — Even if exigent circumstances excuse you, why didn't you — why didn't you have an obligation to bargain under effects? With respect to effects, I don't think that ever comes into play with respect to storage of PPE. This isn't something where that's — because it's within 14.1 and it deals directly with patient policies and procedures dealing with treatment of patients, that goes — it's an exclusive right under 14.1. But what about the rules about who could use it and when they could use it and so on? It still comes within 14.1, and there's no claim with respect to that to the contrary. Yes, there is. As I understand it, the claim is this is all about employee safety. No, that's — the claim here is that it doesn't come within — that there's a change of policy, but this is strictly within management's right because once it became directly related to patient care, that makes it within the exclusive right under 14.1. Even if it has a major impact on employee safety? Again, if it's not been — if it's not — there's no position — they haven't pointed to a provision in the collective bargaining agreement that would take this out of 14.1. I was going to ask that. I mean, is there an employee safety provision or something? To your point, that's not in this record. If you look at the joint appendix that has the collective bargaining agreement, the relevant provisions have been reproduced. Those are 59.1, 14.1, 14.2, and 14.3 because that's what this case has been about. And under 14.1, there is a broad exclusive right of the hospital to dictate procedures with respect to patient safety, and that's what this comes under. But it also says to determine or change the methods and means by which its operations are to be carried on, which is arguably even broader. That's correct. It's a management operations position. Employee safety may be part of that, but it's also part of the methods of operation. Absolutely, Your Honor. It seems to come back to the issue of the discipline, and I would ask you to address Judge Berzon's question to Mr. Hickson. Why, at least, was there not a duty to bargain over the disciplinary features of this policy? To your point, I guess there's no issue with the disciplinary action. It's the language says up to and including termination, and it was too broad in that discussion. I'm sorry, but I'm not hearing you. It's language that what? It's the language about they're hanging their hat on this language about could include termination. I understand that you think the slide is just kind of too generic and doesn't trigger the obligation, but let's just assume for a moment that's not correct. If that's not correct, was there a duty to bargain over that piece of this, the disciplinary piece of this? If it said you will be terminated, yes, because that's job security. But something this broad where that's not what it actually says, it's just a general statement about possible. And, again, there's no evidence that job security was on the line for anybody. Well, Mr. Hickson discussed that. He went into some of the fears of nurses about whether they would be disciplined or even fired for misusing the PPE. How do you address that? No one actually said that they were concerned about being fired. The two nurses who testified about the training said they disagreed with the policy, but there was no claim that anyone would be terminated. And one of the nurses actually didn't complete the training, and there was absolutely no disciplinary action. So there's no real-world issue about either discipline or, more importantly, termination, which is what 14.2 would require. So I don't think they can hang their hat on one broad statement on a slide to be able to get an entire training program that's exclusively within the authority of the hospital. So is your point, then, that that statement on a slide is no different than the background principle that always applies, that, like, follow the policies or you could get in trouble? And so if we focused on the slide, then back to my hand-washing example that you're doing for safety. But in theory, if you don't do that, you might get fired. So then everything would be bargainable under that theory. That's exactly right, Your Honor. Okay. Mr. Das, I think we've gone over time, but I want to make sure that colleagues don't have additional questions for you. Judge Berzon or Judge Van Dyke, any further questions? Mr. Das? It appears not, Mr. Das. I want to thank you for your arguments this morning. Mr. Dixon, thank you for your arguments. This matter is submitted. The court's going to take a five-minute recess before the next case. All rise.
judges: BERZON, BRESS, VANDYKE